**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:

ARTHUR STANLEY ROSENHECK,   Case No. 8:12-bk-07685-KRM
   Chapter 11
   Debtor.
_____/

**MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS**
**OF LAW, AND ORDER DENYING DEBTOR'S MOTION FOR REHEARING**
**OF ORDER GRANTING UNITED STATES TRUSTEE'S**
**MOTION TO CONVERT CHAPTER 11 CASE TO CHAPTER 7**

The Debtor was in financial distress for two years before he filed his Chapter 11 petition on May 17, 2012. He is about 67 years old and essentially retired. In the Statement of Financial Affairs (Document No. 1), he states that he is a "consultant;" his income comes mostly from commercial real estate proceeds and Social Security.

Early in the case, on August 7, 2012, the Office of the United States Trustee filed a motion (Document No. 67) to convert this case to Chapter 7, citing Bankruptcy Code Section 1112(b)(4)(A). The United States Trustee's motion focuses on: (1) the Debtor's expenditures and transfers of assets beyond the reach of creditors of some $1.1 million in the nine months prior to the petition date; (2) the Debtor's negative post-petition cash flow and expenditures for the benefit of third parties; and (3) the Debtor's inability to confirm a Chapter 11 plan, for lack of feasibility and good faith.

The Debtor counters that his cash flow is trending toward positive and that he is taking steps to maximize a distribution to creditors through a Chapter 11 plan, by proposing to pay them about $900,000 over five years. Therefore, the Debtor argues, the plan process should not be pre-empted by conversion to Chapter 7.

The United States Trustee's motion was joined by a creditor, 265 Hempstead Turnpike Associates, LLC ("265 Hempstead"), which holds a $1.4 million unsecured claim.[1] The matter was tried on December 3 and December 17, 2012, and January 28, 2013. The court announced its findings of fact and conclusions of law on February 22, 2013, concluding that "cause" had been shown to grant the relief requested (the "Bench Ruling"). The order converting the case was entered on February 25, 2013 (Doc. No. 253).

This memorandum opinion supplements the Bench Ruling. And, for the reasons set forth below, the motion for rehearing will be denied.

## FINDINGS OF FACT

1. The Debtor filed his voluntary petition under chapter 11 of the Bankruptcy Code on May 17, 2012. The Debtor also filed an executed Declaration Under Penalty of Perjury, attesting to the truth and accuracy of the documents filed with the petition. (UST Exs. 1 and 2).

2. The Debtor's petition states that his debts are primarily business debts.

3. In the two years before this case began, the Debtor was resisting the debt collection efforts of 265 Hempstead and its principal, Mr. Joel Ezra. According to testimony of the Debtor's attorney, Michael Sierra ("Mr. Sierra"), Mr. Ezra had previously been the Debtor's attorney for many years.

4. In 2010, the Debtor owned two residential properties, his exempt homestead in Tampa and a non-exempt condominium in Marathon, Florida. By the time this case began, however, the Debtor was still paying the expenses of both homes, but had taken steps to exempt both properties from creditors: he transferred his Tampa home to his girlfriend (which became her homestead) and then claimed the Marathon condominium as his own homestead.

---

[1] Initially, another creditor, Cadence Bank, joined the United States Trustee's motion to convert, but withdrew its support at the beginning of the evidentiary hearing. Cadence Bank did not otherwise participate in the trial of this matter.

5.     For many years, the Debtor owned adult entertainment businesses and interests in real estate.  According to the Debtor, he suffered a decline in income due to the recession and the availability of adult videos directly through the internet.  By 2010, he had defaulted in payments to various lenders, including 265 Hempstead.

6.     In 2011, the Debtor surrendered nine mortgaged properties to 265 Hempstead, after which he still owed that creditor about $1.4 million.  He attempted to negotiate a discounted payoff, but 265 Hempstead responded with collection lawsuits in state and federal courts in New York.

7.     At all times material to this contested matter, Mr. Sierra was the debtor's lead attorney.  He testified that he headed efforts to negotiate with Mr. Ezra and other creditors by offering a pro rata share of nearly $1 million that the Debtor had received from an asset sale in August 2011.

8.     The original schedules stated that the Debtor owed more than $11 million, including secured debt of $5,516,913, unsecured priority debt of $341,352, and general unsecured debt of $5,376,599.

9.     The schedules stated that the Debtor owns five (5) parcels of real estate, including the Marathon condominium.  The Debtor's original Schedule A stated that each of the parcels of real estate is over-encumbered.  The Debtor also disclosed personal property valued at $1,351,960.24, including cash in an attorney's trust account (originally said to be about $357,000) and interests, exceeding 20%, in 18 different entities.  (UST Ex. 1).

A.  **The Debtor's Pre-Petition Actions**

10.  According to Mr. Sierra, the Debtor was in financial distress in 2010, and should have filed for bankruptcy relief then, even after the Debtor had received $2,714,457.70 from one of his companies, DanRose LLC, in 2008.[2]  (UST Ex. 55).

11.  In 2010, the Debtor transferred his 50% interest in three companies to satisfy antecedent debt stated to be about $250,000.

12.  On or about December 16, 2010, the Debtor transferred to his long-time girlfriend, Yvette Rivera, a life estate in his Tampa homestead for $100.  (Debtor Ex. 4).  On November 9, 2011, the Debtor transferred to Ms. Rivera his remaining interest in the Tampa house.  The Debtor then began to claim the Marathon condo as his homestead.  (Debtor Ex. 6; UST Ex. 1).

13.  About one year before this case, on or about April 14, 2011, the Debtor met with Tampa bankruptcy attorney David Steen who is representing him in this case.  (UST Exs. 27 and 28).

14.  In April or May of 2011, the Debtor transferred to Ms. Rivera his adult bookstore, Pleasures Video, Inc., for a $25,000 promissory note.  (UST Ex. 56, pp. 12-13).  Approximately $10,000 is still due and owing on that note.

15.  Some three months later, an entity in which the Debtor owned a 50% interest, Zerose, LLC, sold its real estate, netting the Debtor $926,850.31 cash, plus an interest in up to another $100,000, being held in a post-closing escrow account.  The Debtor had the $926,850 transferred to the trust account of his other attorney Frank Miranda, to be used for the Debtor's benefit.  (UST Ex. 50, 52).

---

[2]  The disposition of these funds is not disclosed in the record.

4

16. In 2011, the Debtor transferred to Mr. Sierra a 51% interest in (a) ASR Tampa Investments, Inc. ("ASR"), which owns commercial real estate in Tampa, and (b) RSA Investment, Inc. ("RSA"), which operates an adult entertainment business in ASR's property.

17. In the nine months between the Zerose sale and the petition date (from August 19, 2011 to June 12, 2012), the $926,850 was completely exhausted by Attorney Miranda's disbursements on instructions by the Debtor, including:

    a. $50,000 paid by check (#6044) from Mr. Miranda's trust account to bankruptcy attorney David W. Steen on August 19, 2011; this payment was received by Mr. Steen on or about August 22, 2012.  (UST Exs. 52, 27 and 28);

    b. $228,762, paid directly to the Debtor (wires of 8/18/11, 8/23/11, 9/2/11, 9/22/11, 9/26/11, 9/27/11, 10/4/11, 12/12/11, 12/19/11, 12/29/11, 1/9/12, 1/30/12; checks 6036, 6037, 6058, 6110, 6125, 6157, 6215, 6220, 6225, 6265, 6281, 6321; debit of 11/9/11);

    c. $198,787, paid to attorneys for legal fees and retainers (wires of 8/18/11, 9/26/11, 3/16/12; checks 6038, 6039, 6040, 6043, 6044, 6098, 6124, 6139, 6218, 6219, 6252; transfers of 1/23/12, 1/27/12);

    d. $35,549, paid to John Hancock Insurance, to pre-pay the life insurance premiums on policies of which Ms. Rivera is the beneficiary (check 6221);

    e. $13,848.96, paid to Seaview Condominium to pre-pay two years of maintenance fees for the debtor's over-encumbered Marathon condominium (check 6202), in addition to a payment of $1,731.12 (check 6142);

    f. $4,000, paid to the Debtor's mother, Betty Rosenheck (check 6158);

    g $9,165, paid to Bernice Matissimi for the regular mortgage payments on the Tampa home previously conveyed to Ms. Rivera (checks 6059, 6065, 6107, 6127, 6181);

    h. $60,000, paid to All American Title to satisfy the mortgage on the Tampa home previously conveyed to Ms. Rivera (check 6223);

    i. $9,647, paid to American Express for the Debtor's personal credit card (checks 6085, 6165, 6216, 6243);

    j. $30,984, paid to local taxing authorities (checks 6031, 6032, 6084, 6164, 6205, 6214);

 k. $26,922, paid to the Internal Revenue Service (check 6054);

 l. $58,900, paid to RSA after the Debtor had transferred a majority interest to Mr. Sierra (debit of 9/8/11; wires of 9/16/11, 9/20/11, 1/26/12, 1/30/12);

 m. at least $120,476.68, paid directly to contractors to effect improvements to real property owned by ASR which houses the adult entertainment business operated by RSA (checks 6035, 6056, 6060, 6063, 6064, 6080, 6081, 6082, 6097, 6106, 6126, 6129, 6130, 6132, 6135, 6140, 6156, 6176, 6178, 6195, 6196, 6197, 6200, 6201, 6209, 6210, 6211, 6212, 6213, 6217, 6224, 6227, 6244, 6246, 6247, 6248, 6249, 6250, 6251, 6253, 6254, 6263, 6264, 6269, 6270, 6273, 6274, 6279, 6280);

 n. $15,000, paid to Mr. Sierra as interest on outstanding loans (check 6052); and

 o. $3,400, paid to Donald Collado, the Debtor's accountant (check 6090).

(UST Ex. 52).

18. One month before this Chapter 11 case began, on or about April 16, 2012, the Debtor borrowed $500,000 from Mr. Sierra and granted him a security interest in the Debtor's minority interests in various New York businesses. (UST Ex. 50). Based on Mr. Sierra's testimony, it is likely that there is value in these interests in excess of the $500,000 that they collateralize. According to Mr. Sierra's testimony, the amount that he is offering to pay the estate to acquire these interests outright (release of $500,000 claim and $100,000 cash) was suggested by Mr. Steen, the Debtor's bankruptcy attorney.

19. According to the Debtor, he invested some $180,000 in ASR and RSA (in which he owned only a minority interest) to turn the adult bookstore into a combination bookstore and gentlemen's club; this was an attempt to turn a non-profitable business into a profitable one, and provide additional income. According to Mr. Sierra, the business is not yet profitable.

20. On the date of filing of this case, there remained only about $339,439 of the $500,000 borrowed from Mr. Sierra in April 2012 and held in trust by Attorney Miranda (not the $357,000, as stated in the schedules). Subsequently those funds were transferred to the

debtor-in-possession account. (UST Exs. 9 and 61). Less than $320,000 of those funds remain in the estate today.

   **B.**  **The Debtor's Chapter 11 Case**

   21. Initially, the Debtor's Schedule I stated his current gross monthly income from all sources as being only $6,313.27; but, his monthly expenses were stated on Schedule J to be $18,317.01. These expenses include, among other things, payments of $2,811.64 for the Marathon condo mortgage; $5,300 per month for life insurance premiums; and $5,833.33 per month for debt service payments to Mr. Sierra. (UST Ex. 1).

   22. The Debtor's original Statement of Financial Affairs, at paragraph 1, listed his 2012 income as: $10,000 from employment or operation of business, $10,100 from Social Security, and $1,000 from his transfer to Mr. Sierra of 51% interests in RSA and ASR. The Debtor listed his total income for 2011 as $6,000 from Social Security. The Debtor omitted any prospective income from Pleasures Video. The Debtor's income for 2010 was stated to be about $125,000: $78,000 from employment or operation of business, $14,229 interest income; and $33,634 from capital gains. (UST Ex 1).

   23. The Debtor's original Statement of Financial Affairs, at paragraph 3(b), listed substantial payments made within 90 days of the petition date: American Express, $27,614; Michael Sierra, $50,818; Tsunis Gasparis Lustig & Ring, $26,500; and Attorney Miranda, $17,810. (UST Ex. 1).

   24. The Debtor's original Statement of Financial Affairs, at paragraph 10, listed the transfer within 2 years of: the majority interests in RSA and ASR to Mr. Sierra, each for "$100,000 value received," as well as the transfer to Mr. Sierra of a security interest in the Debtor's interest in the nine New York entities, for "$500,000 value received." No other transfers

were listed.   (UST Ex. 1).

25.    The Debtor's original Statement of Financial Affairs, at paragraph 4, lists three pending New York lawsuits brought by 265 Hempstead, and one pending New York lawsuit brought by Cadence Bank.   (UST Ex. 1).

26.    Shortly after the petition date, on May 29, 2012, the Debtor amended Schedules B, D, and F to:   increase the aggregate value of the six Florida entities in which the debtor holds an interest, from $178,900 to $226,000; reduce the amount of funds held in the trust account of Attorney Miranda to $355,000; and adjust the amount of the unsecured portion of the claim of Mr. Sierra from $21,100 to $0.   (UST Ex. 5).

27.    Also on May 29, 2012, the Debtor filed an Amended Statement of Financial Affairs, changing the value he received from Mr. Sierra for the 51% interests in RSA and ASR, from "$100,000 value received" each to "1,000 combined value received."   (UST Ex. 6).

28.    Six months later, during this contested matter, on December 13, 2012, the Debtor filed additional amendments to Schedules A, B, D, and E:   changing the value of, and security interests in, two parcels of real property in Farmingdale, New York; adjusting the aggregate value of his interests in various entities, upward by approximately $38,000; changing the value of his interest in the Zeroes' sale escrow deposit from $50,000 to $100,000; adding various claims for avoidance of preferential transfers; and reducing the amount of funds that were in Attorney Miranda's trust account on the petition date, from $355,000 to $339,439.69.   (UST Ex. 61).

29.    Also, on December 13, 2012, the Debtor filed another amendment of his Statement of Financial Affairs:   at paragraph 1, the Debtor increased his 2011 income from employment or operation of business to $65,200, and added the receipt of $1,026,850.31 from the Zeroes land sale; at paragraph 3(c), the Debtor listed the payment to his mother, Betty Rosenheck, as $6,000;

and at paragraph 10, the Debtor listed the sale of his stock in Pleasures Video to Ms. Rivera, "Insider," for $25,000.

30. Each of the Debtor's monthly reports for the post-petition months of May through November 2012 show net cash losses. The aggregate loss at the end of November 2012 was $20,893. (UST Exs. 8, 9, 10, 11, 12, 13 and 63).

31. The Debtor's monthly reports for December 2012 and January 2013 (Document Nos. 239 and 249) show continued negative cash flow of $2,629.90 and $1,359.69, respectively.

32. During the administration of the case, the Debtor continued to pay debt service and expenses of his declared homestead in Marathon, while paying the expenses of the Tampa home now owned by Ms. Rivera. (UST Exs. 8, 9, 10, 11, 12, 13 and 63).

33. The Debtor maintains five life insurance policies, with a death benefit of more than $3 million, payable to Ms. Rivera. (UST Exs. 40, 41, 42, 43, 44). The annual premiums for these policies exceed $50,000.

34. The Debtor testified that his adult entertainment businesses generate little profit. (UST Ex. 56, p. 21; Ex. 58, pp. 14, 32).

35. The Debtor testified that he paid off the balance of his American Express card, in the amount of $17,894.56, within days of the Chapter 11 filing, in order to continue to use the card after filing. (UST Ex. 58, p. 52-53). He continued to incur debt on his American Express credit card after filing the Chapter 11 petition.

36. Post-petition the Debtor continued to pay rent of $355 per month for a storage facility in New York, even though the contents are "not worth anything." (UST Ex. 59, p. 111, Exs. 8, 9, 10, 11, 12, 12, and 63).

37.     The Debtor paid professional fees to his attorney and accountant post-petition, although some or all of the fees were recovered after discussion with the United States Trustee. (UST's Exs. 10, 11).

38.     The Debtor did not receive any reported income from Pleasures Video during the first six months of this case.  (UST Exs. 8, 9, 10, 11, 12, 13, and 63).

39.     The Debtor began his employment at Pleasures Video after this contested matter was commenced, in late 2012, gradually taking over the jobs of two former employees -- a manager and bookkeeper.  The debtor has also continued his role as a consultant to other adult businesses in which he has some interest, and continued to monitor and direct the development of RSA and ASR.

    C.    **The Debtor's Plan Proposals**

40.     The Debtor filed his first Plan of Reorganization (the "Plan") on September 7, 2012, proposing:

    a.    retention of his Marathon, Florida condominium;

    b.    payment of interest-only at 7%, on the $200,000 secured claim of Mr. Sierra, with a balloon payment due in 3 years;

    c.    sale of his interests in the nine New York entities to Mr. Sierra for $600,000, including of the satisfaction of Mr. Sierra's $500,000 secured claim and payment to the estate by Mr. Sierra of $100,000 cash;

    d.    payment of $3,000 per month to unsecured creditors for 60 months; and

    e.    recovery of the $100,000 escrow deposit and preferential transfers (including $60,000 plus from Ms. Rivera).

41.     After the trial of this contested matter began, the Debtor filed an Amended Disclosure Statement on December 28, 2012, increasing his projected income to $163,255: including $2,020 per month from Social Security ($24,240 per year); $2,804.62 per month of

consulting fees from Frank Crum ($33,655.44 per year); $2,000 per month ($24,000 per year) from Video Warehouse; $2,000 per month of consulting fees ($24,000 per year) from Osborne Investments; and doubling to $4,800 per month ($57,600) the salary from employment by Pleasures Video.  (UST Exs. 66, 67).

42. The Debtor's Amended Disclosure Statement, filed December 28, 2012, at Exhibit C, lists expenses of $2,841.10 per month ($34,093.20 per year) for the Marathon condo mortgage, and $4,300 per month ($51,600 per year) for the life insurance policies for the benefit of Ms. Rivera.  These two expenses ($85,000 per year) represent more than 50% of the Debtor's gross projected income, but confer no benefit on his creditors.  (UST Ex. 66).

43. During the pendency of this contested matter, the Debtor filed three disclosure statements, to project higher income over the next five years:

| Income | Amended Disclosure Statement (Sept. 2012) | Second Amended Disclosure Statement (Sept. 2012) | Disclosure Statement (Dec. 2012) |
|---|---|---|---|
| Social Security | $2,020.00 | $2,020.00 | $2,020.00 |
| Frank Crum | $2,804.62 | $2,804.62 | $2,804.62 |
| RSA | $2,600.00 | **$2,500.00** | **$0** |
| Pleasures Video | $2,700.00 | **$2,300.00** | **$4,800.00** |
| Video Warehouse | $2,000.00 | $2,000.00 | $2,000.00 |
| Osborne Investments | $2,500.00 | $2,000.00 | $2,000.00 |

(UST Exs. 24, 26, 66).

44. The Debtor testified that the increase from $2,300.00 to $4,800.00 per month from Pleasures Video will result from his assuming the duties of the former bookkeeper and manager. (UST Exs. 26, 66).

45. In the Amended Disclosure Statement, filed on December 28, 2012, the Debtor lists

Yvette Rivera and her daughter, Valerie Rivera, as "insiders" for the first time. (UST Ex. 66, p.3). The Debtor disclosed that he has lived with Ms. Rivera for the past eighteen years and such transfers were "in the nature of expenses of a family unit, not gifts." (UST Ex. 66, p. 11).

46.     On January 9, 2013, during this contested matter, the Debtor filed yet another amended plan. This Second Amended Plan added a provision for a pro rata payment to unsecured creditors of the $320,000 cash on hand, after payment of administrative and priority claims, and pro rata payments of $3,000 per month. (UST Ex. 67. p. 19-20).

47.     On February 1, 2013, after the close of the record in this contested matter, the Debtor filed a Third Amended Plan (Doc. No. 237), proposing to pay *$6,800* per month to unsecured creditors for 60 months ($408,000) – derived from the projected enhanced salary from Pleasures Video ($4,800 per month) and from proposed "savings" of some $3,500 per month from surrendering the Marathon homestead to the lender. This Third Amended Plan also included, for the first time, the proposal that if "any party in interest objects to the sale of collateral to the secured creditor, Michael Sierra, the Debtor will offer the collateral for sale through a bidding process to be approved by the Bankruptcy Court." None of these changes were vetted in the trial of the Trustee's motion to convert.

## CONCLUSIONS OF LAW

The United States Trustee and 265 Hempstead argue that cause for conversion of the case exists under § 1112(b)(4)(A), because of the substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. Determining "cause" is within the discretion of the court. *In re Keeley and Grabinski Land Partnership*, 460 B.R. 520, 535 (Bankr. D. N.D.) (2011); *In re Pegasus Wireless*, 391 Fed. Appx. 802, 803 (11th Cir. 2010). The movant has the initial burden of establishing cause for conversion. *Keeley*, 460 B.R. at 535; *In re*

*Schultz*, 436 B.R. 170, 174-75 (Bankr. M.D. Fla. 2010). Under § 1112(b)(4)(A), it is necessary to prove both a significant continuing loss or diminution of the estate *and* a lack of reasonable likelihood of rehabilitation to establish cause. *Keeley*, 460 B.R. at *539*; *In re Fall*, 405 B.R. 863, 867, *aff'd* 2009 WL 974538 (N.D. Ohio 2009).

If "cause" has been shown under § 1112(b)(4)(A) (from continuing loss), the court must dismiss or convert the case, unless there are specific "unusual circumstances" establishing that conversion or dismissal would not be in the best interests of creditors and the estate. 11 U.S.C § 1112(b)(2). *In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007); *In re Brooks*, 488 B.R. 483, 489 (Bankr. N.D. Ga. 2013). This is the statutory safety-valve, permitting the court to refrain from converting a case, even if "cause" has been proven.

The standard under § 1112(b)(4)(A) is not a technical one of whether the Debtor can confirm a plan, but, rather, whether the Debtor's business prospects justify continuance of the reorganization effort. *See Quarles v. United States Trustee*, 194 B.R. 94, 97 (W.D. Va. 1996) (no likelihood of rehabilitation where debtor was losing money and only hope of reorganization depended entirely on speculative outcomes in pending litigation); *Johnston v. Jem Dev.Co. (In re Johnston),* 149 B.R. 158, 162 (B.A.P. 9th Cir. 1992) (debtor lacked sufficient income to fund a plan); *In re Citi-Toledo Partners,* 170 B.R. 602, 606-07 (Bankr. N.D. Ohio 1994); *In re Continental Holdings, Inc.,* 170 B.R. 919, 931 (Bankr. N.D. Ohio 1994) (debtor lacked reasonably certain source of income); *In re Schriock Constr., Inc.,* 167 B.R. 569, 576 (Bankr. D. N.D. 1994); *In re* Hinchliffe, 164 B.R. 45, 52 (Bankr. E.D. Pa. 1994); *In re Great Am. Pyramid Joint Venture,* 144 B.R. 780, 790 (Bankr. W.D. Tenn. 1992) (defining concept of "rehabilitation"). The likelihood of rehabilitation of the debtor's estate does not mean only the ability to confirm a plan; it means something more, "to put back in good condition; reestablish on a firm, sound basis." *In*

*re Fall*, 405 B.R. at 867-868, *quoting In re The V Companies and V-S Architects, Inc.*, 274 B.R. 721, 725 (Bankr. N.D. Ohio 2002).

In addition to the argument for converting the case for cause under § 1112(b)(4)(A), the United States Trustee and 265 Hempstead have also argued that the case should be converted to Chapter 7 because this Chapter 11 case was not filed in good faith. The court will address both of these arguments below.

## ANALYSIS AND CONCLUSIONS

### 1. There has been a continuing loss to or diminution of the estate.

Diminution of assets has continued during this case. The $339,000 of cash on the petition date is now less than $320,000. There have been deficits in cash flow every month during the case. There has also been a pattern of the Debtor paying expenses that were not necessary for the estate, including payments for two households and payments of expenses of Ms. Rivera and her adult daughter. All the Debtor can say is that the trend is becoming less of a problem, that it is trending in the right direction. This continued post-petition loss of cash is sufficient to satisfy the first requirement of Section 1112(b)(4)(A). *In re Fall*, 405 B.R. at 867, *citing In re Schriock Construction, Inc.*, 167 B.R. 569, 575 (Bankr. D. N.D. 1994); *In re Taub*, 427 B.R. 208, 231 (Bankr. E.D. N.Y. 2010).

### 2. There is no likelihood of rehabilitation.

There is no real expansion of business or any credible new source of income for the Debtor to fund his plan. The Debtor proposed to provide cash to creditors by cutting expenses and drawing a gross salary of $57,600 per year from Pleasures Video. The earlier reorganization plans that originally called for retention of the Marathon condo have now been superseded – after months of mortgage payments on that property -- by a Third Amended Plan, which proposes the

surrender of the condo to the lender. The Debtor's original plan was premised on a projection of income of $2,300 per month from Pleasures Video; but during the pendency of this contested matter the projection was increased to $4,800 per month. The Debtor offers to work for Ms. Rivera's company for $57,600 per year, while he will be paying $51,000 per year to provide her with life insurance benefits. Pleasures Video has not been profitable; and the Debtor does not control it. Accordingly, the proposal to cause this unprofitable business to fund the plan is not credible.

The Debtor has not shown, on this record, that he can reestablish his finances on a sound basis. His stated sources of income are speculative. Rehabilitation "contemplates the successful maintenance or reestablishment of the debtor's business operations." *In re Vallambrosa Holdings*, 419 B.R. 81, 89 (Bankr. S.D. Ga. 2009) (internal citations omitted). The Debtor has shown no ability to successfully reestablish or meet required plan payments, pay future income taxes, and pay off the $200,000 secured debt owed to Mr. Sierra which will come due in three years. In addition, the Debtor's commitment to pursue preferential transfers, particularly those made to his girlfriend in 2011, does not appear genuine or realistic.

For these reasons, the United States Trustee has met its burden of showing that cause exists to convert the case to Chapter 7. There is a substantial diminution of the estate and continuing losses and there is no reasonable likelihood of rehabilitation. Thus, conversion of the case is mandatory unless: (1) there are "unusual circumstances which establish that conversion is "not in the best interests of creditors and the estate" and (2) there is a reasonable likelihood that a plan will be timely confirmed. 11 U.S.C. § 112(b)(2).

### 3. No Unusual Circumstances to Deny Conversion.

It is unlikely that the Third Amended Plan can be confirmed. The Debtor has engaged in a two-year effort, while he was in financial distress, to put his assets beyond the reach of creditors. The Debtor moved into the Marathon condo to produce two homesteaded properties for his unified family, while using his money to finance both of them. He granted ownership interests and liens on assets to his long-time attorney, who appears from the testimony to have been the chief strategist for the bankruptcy planning. He granted liens on his assets to that attorney where the loan-to-value ratios are suspect. The Debtor invested substantial sums in RSA and ASR after he transferred the majority ownership to his attorney. He disposed of nearly $1.1 million in a nine-month period, but now proposes to restore a portion of that amount over five years, by working until the age of 73 for an unprofitable business.

The Plan's benefits to creditors are illusory. The assets that are said to be available for distribution under the Plan will be the same in Chapter 7 -- except for the Debtor's projected salary and Mr. Sierra's $100,000 purchase. In a Chapter 7 case, the trustee can pursue the same avoidance actions, collect the same rents, collect the $100,000 escrow deposit, and sell the Debtor's interests in his businesses, possibly for more than is being offered by Mr. Sierra.

The Debtor proposes to retain a Tampa attorney as "special counsel," to enforce avoidance actions against his girlfriend and others. But, there is no budgeted funding to support that effort or mechanism for disinterested supervision or direction of this special counsel.

The purchase price offered by Mr. Sierra for the New York businesses was suggested by Mr. Steen, Debtor's bankruptcy counsel. There is no valuation to support the fairness of the sale of the New York properties to Mr. Sierra. The amount to be paid is suspect in the absence of a valuation to support the fairness of the sale.

For all these reasons, it seems likely that the plan cannot satisfy the requirements of Sections 1129(a)(3) (good faith), (a)(11) (feasibility) or Section 1129(a)(15) (use of all disposable income to pay creditors).  Accordingly, there have been no unusual circumstances presented that would establish that conversion of this case would not be in the best interest of creditors.  Further, there has been no showing of a reasonable justification for the acts and omissions of the Debtor in this case.

### 4. **Bad Faith**.

For nearly a year, and while represented by Mr. Sierra and Mr. Steen, the Debtor executed a comprehensive strategy to protect assets and plan for bankruptcy.  It included the expenditure of nearly $1.1 million plus the encumbering of virtually all of his assets, mostly to block an aggressive creditor's debt collection efforts.  The Debtor had in-hand about $926,000 in August of 2011, put it in an attorney's trust account, and used it, among other things, to prepay premiums for life insurance for the benefit of his girlfriend and pay off the mortgage on her house.

On the eve of bankruptcy, the Debtor borrowed another $500,000 from his attorney, as the premise for encumbering valuable business interests, followed by the re-investment of a portion of the loan proceeds in businesses (RSA and ASR) owned by that attorney.  At the end of nine months, when this case was filed, the Debtor had only about $339,000 remaining (from the nearly $1.4 million), and all of his other assets were encumbered.

To determine whether a case is filed in bad faith, a court must find "an intent to abuse the judicial process and the purposes of reorganization provisions or in particular, which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights under state law." *In re Phoenix Piccadilly, Ltd.*, 849 F.2d at 1394 (*quoting Albany Partners*, 749 F.2d at 674).  A finding of bad faith is an alternative cause for conversion of this case.  *Id*.

This case was filed to obtain a discharge, after the Debtor spent approximately $1.1 million and encumbered substantially all of his assets within the nine months prior to the filing. The Debtor has continued to support two households (his girlfriend's and his own), has continued to pay storage fees for assets of no value, pay expenses of his girlfriend's adult daughter, continued the use of an American Express card post-petition, and paid professionals without a court order. As stated above, the proposed plan offers only illusory benefit to unsecured creditors and is premised on projected income which is not credible. Therefore, the Court also concludes that the Debtor did not file this case in good faith.

**5. The Motion for Rehearing.**

A motion for reconsideration pursuant to Bankruptcy Rules 9023 and/or 9024 should be granted sparingly and should only be granted where there is a "change in a factual or a legal underpinning upon which the [prior] decision was based." *Taylor Woodrow Constr. V. Sarasota/Manatee*, 814 F. Supp. 1072, 1072-73 (M.D. Fla. 1993). Motions should not be utilized to provide parties and avenue to relitigate issues that a court has already ruled upon. *Id.*

On March 11, 2013, the Debtor filed a motion (Document No. 274) seeking a rehearing of the order converting the case. The Debtor makes the following points:

(a) the Debtor's stated intention to work for 6 years to fund the plan was not rebutted;

(b) the value of the New York businesses can be tested by a public auction, if a party in interest objects to the price offered by Mr. Sierra;

(c) the Court failed to take into account that unsecured creditors may prefer the "benefits" of the debtor's Chapter 11 plan;

(d) the proposed special counsel to pursue avoidance actions would be paid from the $300,000 cash on hand;

(e) the Debtor's willingness to change his plan proposals in response to the U. S. Trustee's Motion is actually a sign of "good faith"; and

(f) in a motion to dismiss, all doubts must be resolved in favor of the Debtor;

It is true that the Debtor's stated intention to fund his Plan, in part, from future employment was not rebutted. Therefore, the court accepts the Debtor's intention, as stated. But, the entire proposal – that the Debtor will replace about half of the pre-petition cash that he put beyond the reach of creditors by doing something he has not done previously (work as a manager and bookkeeper) for a company that he does not own and is not profitable – is not credible.

And, the proposed sale of his interests in the New York businesses to his attorney is not validated by the alternative auction process.[3] The liens on these interests, which Mr. Sierra would release for a credit against the purchase price, arose from the $500,000 loan made within a month prior to the bankruptcy. But some $180,000 of that "loan" was promptly reinvested by the Debtor in RSA and ASR, which Mr. Sierra owns. In other words, a substantial portion of the loan proceeds were returned to the benefit of Mr. Sierra prior to the bankruptcy; yet, he is to be given a $500,000 credit for the purchase price.

The Debtor's motion for rehearing does not offer any new evidence or change in law that would compel a new trial. The motion only reargues the findings and determinations made by the Court in the Bench Ruling, premised on the assertions that dismissal is seldom accepted at the initial stage of a Chapter 11 case and that, since the burden of proof is on the party seeking dismissal, all doubts must be resolved in favor of the debtor. *In re Momentum Hospitality III, LLC*, 418 B.R. 442, 445, (Bankr. M.D. Fla. 2009) (court deferred ruling on whether debtors, whose stock had been pledged to secured creditor, had authority to file Chapter 11 case).

But that approach – giving a debtor time to rehabilitate and sell a plan to creditors – cannot override the statute, which mandates conversion or dismissal if cause is proven by a preponderance

---

[3] This feature was only added by the debtor on February 1, 2013, in the Third Amended Plan, after the close of evidence.

of evidence. The statutory safety-valve is not that of resolving all doubts in favor of the debtor – the interest of the debtor is not even mentioned in § 1112(b)(2) – but in the finding that there are unusual circumstances that make conversion or dismissal not in the best interests of creditors and the estate. Such a finding is not warranted here.

## **CONCLUSION**

The Court restates and confirms the Bench Ruling, that the United States Trustee established sufficient cause for conversion of this case to Chapter 7. And, no unusual circumstances exist to override the mandate of conversion of the case. The Debtor, in his motion for rehearing, offers no new evidence of changes in law. In effect, the Debtor reargues the decision previously announced in Court. Accordingly, for the reasons stated herein, the Debtor's motion for rehearing is denied.

DONE and ORDERED in Chambers at Tampa, Florida, on <u>April 29, 2013</u>.

_____
K. Rodney May
United States Bankruptcy Judge